**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

**FILED**
**AUGUST 18, 2022**
**In the Office of the Clerk of Court**
**WA State Court of Appeals Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | |
|---|---|
| In the Matter of the Dependency of ) | |
| ) | No. 38027-1-III |
| Q.S. ) | Cons. w/ 38028-9-III |
| ) | |
| In the Matter of the Dependency of ) | ORDER GRANTING MOTION TO |
| ) | PUBLISH |
| S.S. ) | |
| ) | |

THE FOLLOWING have filed motions to publish the opinion filed by the court on June 7, 2022: Jill Reuter on behalf of appellant, D.C. Cronin, Claire Carden on behalf of Northwest Justice Project, Washington Defender Association, American Civil Liberties Union, Public Defender Association & Family Violence Appellate Project, Karen Lindholdt on behalf of Washington State Office of Civil Legal Aid. The court has reviewed the motions and is of the opinion the motion should be granted. Therefore,

IT IS ORDERED, the motion to publish is granted. The opinion filed by the court on June 7, 2022, shall be modified on page 1 to designate it is a published opinion and on page 37 by deletion of the following language:

A majority of the panel has determined that this opinion will not be printed in the Washington Appellate Reports but it will be filed for public record pursuant to RCW 2.06.040.

PANEL: Judges Fearing, Siddoway, Staab

BY A MAJORITY:

_____
Laurel H. Siddoway, Chief Judge

**FILED**
**JUNE 7, 2022**
**In the Office of the Clerk of Court**
**WA State Court of Appeals Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | |
| | ) | No. 38027-1-III |
| Q.S. | ) | Cons. w/ 38028-9-III |
| | ) | |
| In the Matter of the Dependency of | ) | |
| | ) | |
| S.S. | ) | UNPUBLISHED OPINION |
| | ) | |

FEARING, J. — Mark Sebastian appeals the order of dependency and foster care placement of his two minor sons. Sebastian contends that the evidence did not support a dependency or removal from his custody. Because the superior court did not identify the evidence supporting a key finding that continued care of the boys by Sebastian would constitute a danger of substantial damage to the children's mental or physical development, we carefully review all testimony presented at the dependency fact-finding hearing. We find the evidence wanting and reverse the order of dependency.

FACTS

The State of Washington's Department of Children, Youth, and Families (DCYF) filed a petition to declare Mark Sebastian's two sons to be dependents of the State and to

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

place the two boys in the State's custody.  Sebastian's two sons are six-year-old Quinton

and five-year-old Sonny.  Quinton lies on the autism spectrum.  We use pseudonyms

rather than initials for the father and sons to humanize them.  The boys' mother, who was

also the father's companion, died in November 2018.  We draw the facts from testimony

at the dependency fact-finding hearing.

Father Mark Sebastian grew up in foster care.  According to Sebastian, he suffered

abuse while in foster homes.  By the age of nine, he had been molested six times.  At an

unknown date, an unidentified medical provider diagnosed Mark Sebastian with

schizoaffective disorder, bipolar type.  The provider prescribed Sebastian olanzapine for

agitation, anxiety, and psychosis.

Mark Sebastian, Quinton, and Sonny resided in Florida with the boys' mother until

2018.  In early 2018, the family moved to Spokane, where they resided alternately with

friends and the children's maternal grandparents.  On an unidentified date, after an

argument with the children's mother, Sebastian returned with Quinton and Sonny, and

without the mother, to Florida.

While driving through Mississippi en route to Florida, law enforcement stopped

Mark Sebastian's car.  According to Sebastian, a black lady, who had seen biracial

children in the vehicle, called the police.  During the stop, the law enforcement officer

asked Sebastian why Sonny did not speak.  Although the record shows that Quinton is the

only son with autism, Sebastian replied that Sonny had autism.  The officer removed

2

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

Quinton and Sonny from the car and informed Sebastian that, if neither child showed signs of abuse or neglect following an examination by a physician, Sebastian could continue on his journey with his sons. Subsequently, Mississippi Child Protective Services (CPS) placed Quinton and Sonny into custody for forty-five days. Presumably the trio thereafter traveled further to Florida.

In the summer of 2018, Mark Sebastian and his sons returned to Spokane, at which time they started living with friends. The friends later directed Sebastian to vacate the residence. The trio then lived in a van for two to three months.

Beginning in October 2018, Mark Sebastian consistently and voluntarily visited counselor Grace Hatch at Frontier Behavioral Health for weekly, hour-long, counseling sessions. He continued to meet with Hatch at the time of the December 2020 dependency fact-finding hearing. Hatch gave Sebastian a new diagnosis, unspecified depressive disorder. At an unidentified time, Sebastian ceased taking olanzapine.

The children's mother died on November 5, 2018, due to a pulmonary embolism. In mid-November 2018, Sebastian, Quinton, and Sonny moved into an apartment.

After moving into the apartment, Mark Sebastian occasionally left his children at Spokane's Vanessa Behan. Vanessa Behan provides support services for children, including round the clock respite care for children under seven years old. Vanessa Behan Program Director Christina O'Hara testified at trial that Mark Sebastian is a caring and involved father. Quinton and Sonny always looked well-groomed and fed. O'Hara

3

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

explained that Sebastian became upset when Vanessa Behan sought a closer relationship with him. Due to Sebastian's behavior, O'Hara directed that no staff member be alone with him.

In July 2019, Washington State CPS social worker Sarah Paukstis investigated an allegation against Mark Sebastian. During trial, Paukstis testified that someone claimed Sebastian threw his children's empty car seats across the hospital parking lot following a hospital visit, during which visit he purportedly concluded that health care providers did not treat him appropriately. According to the allegations, Sebastian also yelled at Quinton and Sonny, whose faces reminded him of their deceased mother. He threatened to hit his sons if they continued to look at him. Paukstis characterized her response to this allegation as a "risk only intake," meaning that no one alleged Sebastian engaged in abuse or neglect of a child. Report of Proceedings (RP) at 199.

Following the July 2019 incident, DCYF assigned Sarah Paukstis to assist Mark Sebastian with his two boys. In July, Sebastian voluntarily completed a parenting education program, Promoting First Relationships (PFR). Social workers refer to PFR as an evidence-based program. An evidence-based program reportedly is rigorously tested in controlled settings, proven effective, and translated into practical models. Paukstis observed, during the summer of 2019, that Sebastian adequately parented Quinton and Sonny in part because of community support. Sebastian had enrolled his sons full-time in Head Start at Spokane's West Central Community Center, and Quinton participated in

4

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

services at the Northwest Autism Center. At some unidentified time, Mark Sebastian recommended taking olanzapine.

During the fact-finding hearing, Mark Sebastian stated that he enjoyed community support. He testified to his dislike for CPS because of his traumatic experiences as a child in foster care. When he attempted to explain his dislike for CPS to others, nobody, including staff from Vanessa Behan and DCYF, listened to him. He did not wish to be belligerent, but, when others do not listen, he must raise his voice.

In October 2019, CPS received an allegation that Mark Sebastian acted erratically and aggressively at a physician's office. Sebastian purportedly swung his fist at another patient in the lobby and told hospital staff that his children were "a pain in the ass." RP at 199. Sebastian also allegedly struck one of his children in the face with an open hand. Sarah Paukstis responded to the allegation. CPS took no steps as a result of the report.

In December 2019, CPS received a report of Mark Sebastian escalating his behavior when he left Quinton and Sonny at Vanessa Behan. The report alleged that one of Sebastian's sons suffered from a fever. Sebastian purportedly remarked to a Vanessa Behan staff member that he would take his child home and "give him some more Tylenol so he dies." RP at 199. CPS did not consider the report to constitute an allegation of abuse or neglect of a child.

In February 2020, CPS closed its file on Mark Sebastian after concluding that Sebastian did not threaten the safety of Quinton and Sonny. Sebastian then pulled the

5

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

boys from full-time childcare at the West Central Community Center due to concerns about their treatment at the center. Quinton also ended services for Quinton at Northwest Autism Center. Sebastian thereafter again ended taking olanzapine.

In July 2020, someone reported Mark Sebastian to CPS because of a purported mark on Sonny's buttocks. The report alleged that Sebastian told a friend that he had spanked Sonny. CPS social worker Sarah Paukstis investigated and observed no mark on Sonny. During a conversation with Paukstis, Sebastian expressed being overwhelmed in raising Quinton and Sonny. He conceded difficulty managing the boys' behavior. Sebastian mentioned that, due to his frustrations, he imposed physical discipline on his sons, including spanking Sonny. He had earlier attempted to refrain from corporal punishment.

In July 2020, Sarah Paukstis recommended that Mark Sebastian participate in another evidence-based parenting program, Positive Parenting Program (PPP). Paukstis also recommended that Sebastian reenroll Quinton and Sonny into full-time childcare and Quinton into services at Northwest Autism Center. Paukstis observed a diminution in Sebastian's ability to manage his frustration and his children's behavior, which reduction she attributed to Sebastian's ending the use of olanzapine. Paukstis recommended to Sebastian that he consult with a mental health professional regarding restarting medication.

6

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

Sarah Paukstis visited with Mark Sebastian on occasion in July 2020. She noticed that Sebastian snapped at and physically grabbed Quinton and Sonny from frustration when one or both engaged in typical toddler behavior. Paukstis testified to concern that Quinton and Sonny immediately froze and stopped making noise when Sebastian snapped at one of them.

According to Sarah Paukstis, Sebastian fixated on grievances and hesitated to take advice. RP 205-06. Although Sebastian occasionally uttered threats, he never acted on those threats.

In August 2020, pursuant to Sarah Paukstis' recommendation and referral, Mark Sebastian began a PPP program with family therapist Amy Howko. The program sought to teach Sebastian about positive parenting skills relating to discipline of the boys, redirection of the sons when behaving inappropriately, and setting expectations for the two. At the dependency hearing, Howko averred that the program also attempted to assist Sebastian in parenting an autistic child.

On August 14, 2020, Mark Sebastian missed his PPP appointment with Amy Howko. On August 19, 2020, Sebastian attended an appointment with Howko over zoom, a video telecommunication application. During this appointment, Sebastian expressed frustration regarding the foster care system and fear that the State would take his children from him. His fear arose from his personal experience growing up in foster

7

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

care.  He did not wish for his boys to share his experience.  Sebastian complained that West Central Community Center and DCYF failed him.

During the August 19 appointment, Mark Sebastian informed Amy Howko that he did not need PPP, that he did not wish to participate in the program, and that no one could change his attitude.  Nevertheless, he agreed to continue participating.  Sebastian disclosed to Howko that he suffered from posttraumatic stress disorder (PTSD) and schizophrenia, but he needed no medication to manage his symptoms.  Sebastian added that he did not wish to medicate.

Mark Sebastian failed to show for August 14, August 28, August 31, and September 2, 2020 appointments with Amy Howko.  Howko closed her file on Sebastian.  DCYF social worker Sarah Paukstis testified, during the fact-finding hearing, that PPP was the only contracted evidence-based program offered through DCYF.

On September 3, 2020, CPS investigated another allegation against Mark Sebastian.  Sonny allegedly reported to Vanessa Behan staff that his father had hit him on his back.  Sonny also expressed fear of his father.  The report added that Sonny sustained a small bruise on his back.  Nevertheless, despite this report, Vanessa Behan Director Christina O'Hara, during fact-finding hearing testimony, averred that she observed no mark on Sonny.

On September 3, 2020, CPS social workers Sarah Paukstis and Jessica Hertlein visited Mark Sebastian's apartment to investigate the report from Vanessa Behan.

8

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

Paukstis did not intend to remove Quinton or Sonny from the home. On the social workers' arrival, Sebastian grew agitated. According to Paukstis, Sebastian would not sit, he clenched his fists, and he spoke with a pressured tone. Sebastian appeared to lunge toward the social workers. Hertlein spoke with Sebastian for several minutes, but his frustration increased.

During the September 3 visit, Sarah Paukstis and Jessica Hertlein asked to see Quinton and Sonny, both of whom slept. Mark Sebastian first blocked the ladies' path to the boys' room. Sebastian later relented to the social workers request and agreed to retrieve his children. As he walked from the living room and down the hallway toward their bedroom, Sebastian slammed doors. Paukstis and Hertlein heard Sebastian yank Quinton and Sonny out of bed.

When Mark Sebastian returned to the living room, Sebastian held each boy in an arm and threw each on a couch. Sebastian then removed his sons' clothes to show the social workers that the children maintained no bruises. Jessica Hertlein directed Sebastian not to undress his sons. The boys cried. The social workers observed no physical injuries on either child. CPS determined the September 3, 2020 physical abuse allegation to be unfounded.

During the dependency fact-finding hearing, Mark Sebastian discussed his interaction with Sarah Paukstis and Jessica Hertlein on September 3, 2020. According to Sebastian, he had recently undergone hip surgery. Sebastian implied that, despite alerting

9

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

the social workers of his surgery, they insisted that he pick up Quinton and Sonny at the same time and bring them into the living room for inspection. Sebastian denied manhandling his children, but conceded that Sonny cried after he removed Sonny's shirt. Sebastian admitted being upset, because the children's grandparents had filed another false complaint against him, even though he had never harmed Quinton and Sonny.

Sarah Paukstis and Jessica Hertlein left Mark Sebastian's residence, but called law enforcement to perform a welfare check on the boys. Paukstis and Hertlein returned to the home to meet responding officers. By this time, Sebastian had calmed, and the social workers devised a safety plan with him. Law enforcement officers declined to place the boys into protective custody.

Mark Sebastian consented to his sons staying at Vanessa Behan for the night. According to Sebastian, the social workers bullied him into consenting.

On September 4, 2020, DCYF filed dependency petitions for Quinton and Sonny. The petitions alleged safety threats to the boys due to Sebastian's dangerous and violent behavior.

On September 4, 2020, Jessica Hertlein visited Mark Sebastian's residence with law enforcement to remove Quinton and Sonny. An upset Sebastian scuffled with the officers. The police handcuffed Sebastian, while DCYF removed the two boys.

On September 8, 2020, the superior court commissioner held a shelter care hearing. The commissioner ordered that Quinton and Sonny be placed in foster care.

10

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

The commissioner granted Mark Sebastian visitation with his children three times per week for two hours each time. The court ordered that Sebastian participate in family therapy, individual mental health treatment or counseling, an evidence-based parenting program, if such a program is recommended by the family therapist, and one urinalysis test.

On September 10, 2020, social worker Zadia Short substituted for Sarah Paukstis as the DCYF case worker for Quinton and Sonny. Thereafter Short encountered difficulty in conversing with Mark Sebastian because of his agitation. Short sometimes needed to end her telephone calls with him early. Sebastian meandered off topic. At the fact-finding hearing, Short admitted that Sebastian did not curse or call her names.

During the dependency fact-finding hearing, Zadia Short testified that Mark Sebastian's aggressive parenting did not fit his son's ages. She expressed a belief that Sebastian had failed to remedy any of the deficiencies that led to his children's removal. Nevertheless, Short never explained how she arrived at her conclusions when she never observed the sons with the father. Short had never observed any visits. Zadia Short recommended that Sebastian undergo a neuropsychological evaluation, participate in an evidence-based parenting program, engage in family therapy, and visit with his children presumably as part of the therapy.

Between September 10 and 29, 2020, Mark Sebastian visited Quinton and Sonny on five occasions at Crossroads Visitation. According to Crossroads Visitation's owner

11

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

and director, Leann Kaufman, Sebastian's visits were "rocky." RP at 101. The visits required two supervisors, due to Sebastian's previous threats to a social worker and law enforcement. Two of Sebastian's visits ended early due to his tone and challenging behavior toward the staff. During the dependency fact-finding hearing, Kaufman acknowledged that Sebastian directed his anger to others, not at Quinton or Sonny.

On September 25, 2020, Leann Kaufman informed Mark Sebastian that Quinton would not be present for the next visit, as she did not know the current location of Quinton. This news frustrated Sebastian, who told Kaufman that he would not come to Crossroads Visitation without both children present.

On September 29, 2020, when Mark Sebastian attended the next visitation at Crossroads Visitation, he expressed anger to the staff over Quinton's absence. Leann Kaufman testified that Sebastian repeatedly accused DCYF of stealing his sons. Sebastian commented that he "can't trust white people." RP at 106. Kaufman attempted to redirect Sebastian's focus to the visit. Sebastian screamed profanities at Kaufman. During the commotion, Sonny came to Kaufman and clutched her leg. A visit supervisor intervened, after which Sebastian commented:

> End my visit. I don't care. Take him home. Take my kid away. You already took my other kid away.

RP at 107.

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

During this September 29 visit, Mark Sebastian left Crossroads Visitation and then attempted to reenter. Leann Kaufman met Sebastian outside and informed him that he could not return to the office. Sebastian cursed and yelled profanities. In the process of trying to open something on the inside of his truck, he allegedly ripped the inside of the vehicle's door. We do not know who purportedly observed this conduct. Sebastian later apologized for his behavior. He explained his anger as resulting from his belief that the State had stolen Quinton. Crossroads Visitation declined further visit supervisions.

Throughout October and November 2020, Mark Sebastian participated in eight sessions of family therapy with Johana Rice. Each session lasted from twenty to fifty minutes. Certain sessions were shorter due to Quinton and Sonny's absence. Due to scheduling conflicts, unavailability of the sons, and Sebastian not wishing to attend sessions via Zoom, Rice and Sebastian discontinued family therapy. Sebastian had attended every scheduled family therapy session. Rice does not blame the discontinuance on Sebastian.

Johana Rice testified that a social worker informed her that Mark Sebastian hit his sons. Nevertheless, Rice noticed that records did not confirm any striking. Assuming any abuse occurred, the abuse occurred years earlier.

At the dependency hearing, Johana Rice stated that she had extensive experience working with autistic children, although she had no specialized training in this respect. Through her observations, Rice believed that Mark Sebastian provided for and played

13

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

well with his children. Nevertheless, during every session, Sebastian became dysregulated. During many sessions, Sebastian grew upset and raised his voice. Sebastian struggled to focus on Quinton and Sonny and instead discussed the impact of the foster care system on his children and his belief that DCYF discriminated against him. During the sessions when Quinton and Sonny were present, Rice successfully redirected Sebastian's behavior toward his sons.

During her fact-finding hearing testimony, Johana Rice recommended that Mark Sebastian undergo a neuropsychological evaluation and participate in a program designed to increase his education on Quinton's special needs. Rice also suggested that Sebastian visit with his children only during family therapy or other therapeutic supervision due to difficulty in regulating his emotions. Rice observed that Sebastian's children became upset when Sebastian failed to control his emotions. She believed that his children love him and that Sebastian is passionate about his children.

During her testimony, Mark Sebastian's mental health counselor, Grace Hatch, opined that Sebastian did not need medication to treat his unspecified depressive disorder. Hatch testified to her observations that Sebastian actively utilized others for needed support and underwent needed mental health treatment by consistently attending counseling with her. Hatch opined that Sebastian could safely parent Quinton and Sonny without the aid of medications. She never witnessed any concerning behavior between Sebastian and his children. To the contrary, she noted Sebastian's attention to the boys

14

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

and his redirection of his sons when necessary. Hatch did not recommend that Sebastian undergo a psychological evaluation, because he actively worked toward mental health goals through individual counseling.

Grace Hatch agreed that Mark Sebastian undergoes emotional dysregulation when frustrated. Hatch averred that she never felt threatened by his dysregulation, nor has she noticed his behavior as threatening to Quinton or Sonny. She has no concerns for Sebastian harming others or himself.

National Association for the Advancement of Colored People (NAACP) representative Julie Ancona-Shepard assisted Mark Sebastian with arranging childcare, schooling, and aid for Quinton through Northwest Autism Center. Ancona-Shepard testified that Sebastian did not require much assistance, but that NAACP representatives would continue to assist Sebastian once Quinton and Sonny returned home.

Julie Ancona-Shepard visited Mark Sebastian's home. She observed the home as arranged appropriately for children. The home was cleaner and tidier than her home. The home contained toys, a closet full of clothes, and other items to welcome the boys home. Pictures of the sons hung on the kitchen wall. Ancona-Shepard saw nothing in Sebastian's car suggesting he had ripped the inside of a car door off its hinges.

Julie Ancona-Shepard, who underwent training in cultural bias, assists the NAACP with racial equity problems. She has studied and experienced how implicit bias impacts how agencies interact with people of color. According to Ancona-Shepard,

15

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

white people possess an inherent fear of people of color. This anxiety toward a black person impacts how one treats the person.

Julie Ancona-Shepard averred that implicit racial bias played a role in DCYF's request to remove Quinton and Sonny from Mark Sebastian's care. Sebastian is the stereotypical angry black man, and this stereotype is used against him. Ancona-Shepard attended a shared planning meeting in this case. She heard the social worker complain about the father being loud and frustrated. At trial, Ancona-Shepard testified:

> I don't want to call anybody out in a negative way necessarily, but, yeah, [Mark Sebastian] the [sic] perception that [Mark] comes off is this loud, black man. Definitely was very apparent to me in a lot of these communications, and it's a misrepresentation, you know. It's—I've never had a bad conversation with [Mark], and this whole idea that he is this angry, black guy who is going to hurt somebody is just to me it's crazy, but, again, it plays into the role with that implicit bias, that undo [sic] fear that's generated just due to being around somebody of a different color, and so, yeah, that was definitely something that kind of rubbed me the wrong way.

RP at 161.

From September to December 2020, Quinton resided in three foster homes. Quinton, according to Zadia Short, is active, rambunctious, and curious. Although outgoing, Quinton refuses to talk to some individuals. Quinton and Sonny miss their father. According to Short, the two brothers are close. Both wish to return home.

PROCEDURE

The superior court conducted a contested fact-finding hearing. During the hearing, the parties disputed whether the court should order a dependency, and, if so,

16

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

whether Quinton and Sonny should remain home during the dependency.

At the fact-finding hearing, psychologist Erin Milhem, PhD testified as an expert on behalf of Mark Sebastian. Dr. Milhem had reviewed Sebastian's records. She had not met with Sebastian or his sons, nor had she spoken with any of Sebastian's providers regarding Sebastian's escalating behavior and interactions with his children. Milhem expressed the possibility of Mark Sebastian having been misdiagnosed. She believed that Sebastian could be autistic. She highlighted medical records noting that Sebastian had an inability to make eye contact, used self-stimulatory behavior, such as rocking his body, and encountered difficulty refocusing.

Dr. Erin Milhem accepted as accurate the diagnosis of Quinton being on the autism spectrum. When asked whether the PPP parenting program would be appropriate for an autistic child, Dr. Milhem responded:

> Unfortunately, there's not a ton of research that suggests that that would be a helpful service for that family. It has very, very little research in special needs and/or neuro individuals. The other challenge is that it is not necessarily driven towards individuals that have any kind of diagnoses in the neuro developmental realm.

RP at 225.

Dr. Erin Milhem testified that the Spokane community lacks a parenting program with a focus on autism. Thus, she suggested the Applied Behavioral Analysis (ABA) program, the only evidence-based program focusing on intervention for autistic individuals. Northwest Autism Center offered an ABA program. During cross-

17

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

examination, Dr. Milhem stated that she knew that PPP could "offer different levels of

support" and that the program could be individualized for each person. Milhem averred

that, with the help of Northwest Autism Center, Mark Sebastian could safely parent both

of his sons.

After Julie Ancona-Shepard testified that implicit bias impacted DCYF's

treatment of Mark Sebastian, the superior court judge questioned Ancona-Shepard:

> [THE COURT]: . . . Do you believe that your own implicit bias may
> have turned into some sort of an explicit bias of when you indicate that you
> were rubbed the wrong way by something that you saw during that shared
> planning meeting, something you witnessed?
> THE WITNESS: I don't. So I don't want to sound arrogant, too, so
> please don't take it as such.
> . . . .
> . . . [T]he most recent training series I went through was at the end
> of NAACP we did talk about that and make sure that we keep our own bias
> out of the way when we're dealing with things so that we recognize things.
> . . . .
> So when I say I was rubbed the wrong one [sic], yes, I was—it was
> frustrating to me coming from the groups that I work with and I help work
> at the school district with training around these kind of issues and when
> something is apparent as something comes up as the angry black man. It's
> a poor stereotype that is constantly perpetrated, and I would think that the
> Department would recognize and be able to put, you know, instill things in
> their employees to recognize their own biases[.]

RP at 164-65.

Following the dependency hearing, the superior court commissioner issued an oral

ruling. The court commented, in part:

> [Quinton] appears to have autism. He does have what appears to be
> a valid diagnosis of autism. He, also, is described as being kind and bright.

18

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

He's very curious, and, again, that he misses his dad and his brother. He's been removed from two placements because of those behaviors.

. . . .

The social worker indicated that overall, the kids were pretty happy. That [s]he saw behaviors of autism, but pretty normally functioning kids at that point. She did have concerns for her own safety as dad had made threats to kill her. She heard those through a third-party.

. . . .

I believe that based on the information that I read that the Department has met its burden with regard to dependency. It's obvious to the Court that—I want to read the specific statute. It's obvious to the Court that the children here in this case have no parent or custodian capable of adequately caring for the child such that the child is the circumstance [sic] which constitute danger of substantial damage to the child's psychological or physical development.

RP at 271, 290-91.

Thereafter the superior court entered two written orders of dependency and two orders of disposition, one for each son, which orders included identical findings of fact and conclusions of law. The court found Quinton and Sonny dependent pursuant to RCW 13.34.030(6)(c) and ordered that they be placed in foster care pursuant to RCW 13.34.130(6)(a).

The superior court's findings of fact state, in pertinent part:

1. The parenting deficiencies identified by the Department [DCYF] are that Mr. [Sebastian] needs assistance with parenting skills through ABA intervention and mental health issues. He was offered a voluntary Triple P parenting program prior to the children being removed, but he was not willing to engage with this service. The Department has had multiple contacts with the father since 2018, including several intakes regarding alleged physical abuse and neglect of his children.
2. [Quinton] has been diagnosed with Autism. He has previously engaged in services to address behaviors largely related to his diagnosis.

19

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

3. Mr. [Sebastian] may also have a diagnosis of Autism, but that is speculation only. He has been diagnosed and treated for schizoaffective disorder; bi-polar type and PTSD. A neuro-psychological evaluation is recommended by the family therapist and the father's expert, Dr. Millheim [sic]. The court has no authority to order the father to take medications.

4. The services the department offered were reasonable. It would have been nice if others could have been offered but not required. It is not about what services were referred after pickup.

5. Mr. [Sebastian] is described as someone that frequently dysregulates and is unable to control his emotions; he yells and becomes aggressive, often perseverating on perceived mistreatment by CPS and West Central Community Center. The CPS social worker did not look into the concerns with West Central Community Center, but it was not reasonable to do so at that time. Ms. Rice stated the father had talked about his "military style" parenting and the father testified to use of corporal punishment as a last resort. He has been observed to yell at the children and handle them roughly. His aggressive behaviors were directed at adults in positions of authority and not at the children. He testified that he does not believe that CPS will listen to him. He stated he made a comment regarding "all white people" to his son during a visit and it was ended. The father's witnesses are great supports for him. The NAACP will be a great advocate and supports him.

6. Vanessa Behan Crisis Network has worked with the father for several years. Ms. O'Hara was very supportive of Mr. [Sebastian] and had many positive things to say about him. She testified that the children were on 1:1 supervision, meaning that a staff person had to be present at all times with each child because of the children's behaviors. Around February 2020, the agency also implemented a policy wherein two staff people had to be present with Mr. [Sebastian] at all times because of his behavior.

7. It was remarkable to this court that Mr. [Sebastian's] testimony was in stark contrast to the painted picture the court had received of him as aggressive. His testimony was very forthright, well-spoken, and he had no difficulty maintaining his composure. His timeline could be confusing, which is reasonable in these circumstances. The father perseverates on racial injustice and is preoccupied with the racial makeup of those around him. During testimony, he showed signs of hyper-verbosity, and disorganized thought; although the court makes no diagnoses based on those observations. Mr. [Sebastian] has consistently seen counselor Grace Hatch since 2018. Ms. Hatch is a strong advocate for Mr. [Sebastian] and it

20

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

is evident that she cares for him and giving the best care that she can within the parameters she has been given. It was fairly evident that she did not agree with the underlying diagnosis of schizoaffective disorder, bi-polar type. She appeared to be biased towards her own opinion instead of taking all of the information in, which is somewhat concerning.

8. When Mr. [Sebastian] became involved with the Department in 2019, he successfully completed services and his case was closed. At that time, the children were in Head Start, ECEAP, and were enrolled in the Northwest Autism Center. Mr. [Sebastian] completed Promoting First Relationships parenting program. When the Department became involved again, in July 2020, Mr. [Sebastian] was noticeably more overwhelmed, perseverating, and handling the children roughly. Although he acknowledged using corporal punishment, no marks were seen on the children by the CPS investigators.

9. Dr. Millheim [sic] has expertise in Autism and Autism-related services. She agreed with [Quinton's] Autism diagnosis and feels strongly that Mr. [Sebastian] has been misdiagnosed. He has been noted to rock back and forth and avoid eye contact. Dr. Millhelm [sic] noted that lack of eye-contact and rocking in order to self-soothe may be signs of Autism. She did not believe Triple P was a helpful service for neurologically a-typical families, especially given that it was only occurring virtually. She had the same reservations for family therapy, particularly given the ages of the children. Ms. Millheim [sic] was adamant that in order for Mr. [Sebastian] to successfully parent his children it is necessary for the whole family to participate in Applied Behavioral Analysis (ABA) treatment services. This is an exhaustive wraparound approach. The purpose is to provide services for [Quinton] to be safely parented. She stated that in order to parent an Autistic child, it was necessary to be an "A+" parent. The court understands what was meant by this under the circumstances; that parents with children with autism need this specific training. In the Dependency world, we just need C+ parents. We just need to ensure there is no harm to the child and the child is not in harm's way. Coupled with the rest of the testimony about Mr. [Sebastian] the court wants to see progress in ABA before returning the children home. Ms. Millhelm's [sic] testimony points to a need for out of home placement of the children. Regardless of Mr. [Sebastian's] mental health diagnoses, it has manifested itself in such a way that the father must show progress in the ABA program in order to successfully parent his boys.

21

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

10. The Department needs to provide the child and make him available for ABA services.

11. The commissioner's oral ruling is incorporated by reference herein.

Clerk's Papers (CP) at 411-13, 418-20.

The superior court's findings of fact move from numbers to letters:

B. It is contrary to the child[ren]'s welfare to return home. The child[ren] should be placed or remain in the custody, control, and care of DCYF because:

. . . There is no parent or guardian available to care for such child[.]

. . . .

C. Reasonable efforts have been made by DCYF to prevent or eliminate the need for removal of the child from the child's home and have been unsuccessful because:

. . . Specific services have been offered or provided to the parent(s), guardian or legal custodian and have failed to prevent the need for out-of-home placement and make it possible for the child to return home. The specific services offered or provided are outlined in the Dependency Petition and subsequent documents filed herein and are incorporated by reference.

CP at 413-14, 420-21.

The superior court's order declared in part:

The child is [children are] dependent pursuant to RCW 13.34.030(6)(c).

CP at 414. The order further read:

VISITATION: The Department shall provide a minimum of three visits per week for two hours, supervised at a DCYF approved location. Visitation may be expanded at the discretion of the social worker in agreement with the guardian ad litem. No visits shall occur if the parent appears to be under the influence of drugs/alcohol. A referral for in-person

22

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

> visits shall be made by the social worker today (1/4/21). The father has not
> had a visit since Thanksgiving. The visits are required to be in-person.

CP at 416.

## LAW AND ANALYSIS

On appeal, Mark Sebastian challenges the superior court's declarations of Quinton and Sonny as being dependents and the order removing his sons from his home during the dependency. He contends that insufficient evidence supports the superior court's twin rulings. We hold that the evidence does not support the order of dependency. Therefore, we do not address the legitimacy of placement out of the home.

Mark Sebastian contends that insufficient evidence supports the superior court's findings of fact 1, 4, 7, 9, B, and C. We decline to address the factual support for these findings of fact because we rule in favor of Sebastian on other grounds. We focus on a finding from the superior court's oral ruling that continued custody of the boys by Mark Sebastian constitutes a danger of substantial damage to the son's psychological or physical development.

Both the United States and Washington Constitutions recognize a parent's fundamental liberty interest in care and custody of her children. U.S. CONST. amends. V, XIV; WASH. CONST. art. I, § 3; *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed .2d 599 (1982); *In re Custody of Smith*, 137 Wn.2d 1, 27, 969 P.2d 21 (1998), *aff'd by Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). The

23

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

fundamental liberty interest of a natural parent in the care, custody, and management of

his child does not evaporate simply because he has not been a model parent. *Santosky v.*

*Kramer*, 455 U.S. 745, 753 (1982). The concept that all children are wards of the State

and that the State and its agencies have an unhampered right to determine what is best for

the child belongs to a repudiated political and moral philosophy foreign and repugnant to

American institutions. *In re Welfare of Warren*, 40 Wn.2d 342, 343, 243 P.2d 632

(1952). Courts undertake a grave responsibility when they deprive parents of the care,

custody, and control of their natural children. *In re Welfare of Sego*, 82 Wn.2d 736, 738,

513 P.2d 831 (1973). Based on a constitutional right to the companionship of a parent to

a child and vice versa, the Washington State legislature has declared that "the family unit

should remain intact unless a child's right to conditions of basic nurture, health, or safety

is jeopardized." RCW 13.34.020.

RCW 13.34.030(6) lists four conditions under which a court may declare a child a

dependent of the State of Washington. To declare a child dependent, the trial court must

find by a preponderance of evidence that the child meets one of the statutory definitions.

*In re Welfare of Key*, 119 Wn.2d 600, 612, 836 P.2d 200 (1992); *In re Dependency of*

*C.M.*, 118 Wn. App. 643, 648, 78 P.3d 191 (2003). In this appeal, the State relies on the

definition found in RCW 13.34.030(6)(c). RCW 13.34.030(6)(c) defines "dependent

child," in part, as any child who:

24

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

[h]as no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development.

The language of RCW 13.34.030(6)(c) recognizes the inability to judge the capability or incapability of a parent in the abstract. Simply finding a parent incapable is insufficient for a dependency. Instead, capability and incapability must be evaluated in the context of whether the parenting constitutes a danger of substantial damage to the child's psychological or physical development. The key language of the statute does not permit a dependency based on danger of damage to a child's psyche or injury to body, but danger of damage to the development of the child. Such danger must pose substantial damage, not just damage.

The written findings of fact entered by the superior court fail to include language that Mark Sebastian's parenting of either child poses a danger of substantial damage to the child's psychological or physical development. The superior court's oral ruling includes such language and the written findings of fact incorporate the oral ruling. Still, we wonder why such critical language was omitted from the written findings.

We recognize the need to defer to the trial court's factual decisions. To evaluate a parent's claim of insufficient evidence of dependency, we determine whether substantial evidence supports the court's findings of fact and whether the findings support the conclusions of law. *In re Dependency of S.S.*, 61 Wn. App. 488, 504, 814 P.2d 204

25

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

(1991). In a dependency proceeding, evidence is substantial if, when viewed in the light most favorable to the party prevailing below, it is such that a rational trier of fact could find the fact in question by a preponderance of the evidence. *In re Dependency of C.B.*, 61 Wn. App. 280, 286, 810 P.2d 518 (1991). This court is not to weigh the evidence or the credibility of witnesses. *In re Welfare of Sego*, 82 Wn.2d 736, 739-40 (1973).

The superior court, in its oral ruling, did not identify the evidence on which it determined that Mark Sebastian constituted a danger of substantial damage to either child's psychological or physical development. Thus, the finding is conclusory in nature. Courts universally declare that, when the trial court makes a conclusory finding without specific findings of the important underlying facts necessary to support the ultimate conclusions, the reviewing court may, if not must, make an independent scrutiny of the record to determine whether those underlying facts are present. *Dreyfuse, In re Application to Present Complaint to Grand Jury*, 243 W. Va. 190, 199, 842 S.E.2d 743, 752 (2020); *Morris v. Kanne*, 295 Or. App. 726, 735-36, 436 P.3d 36, 42 (2019); *Adams v. Pinetree Trail Enterprises, LLC*, 347 Ga. App. 697, 699, 820 S.E.2d 735, 736-37 (2018); *Yaekle v. Andrews*, 169 P.3d 196, 201 (Colo. App. 2007), *aff'd on other grounds*, 195 P.3d 1101 (Colo. 2008); *Ex parte Anonymous*, 889 So. 2d 518, 518-19 (Ala. 2003); *Mellum v. Mellum*, 607 N.W.2d 580, 585 (N.D. 2000); *Concord Enterprises, Inc. v. Binder*, 710 A.2d 219, 224-25 (D.C. 1998); *Wilart Associates v. Kapiolani Plaza, Ltd.*,

26

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

7 Haw. App. 354, 361, 766 P.2d 1207, 1211 (1988); *Lombardo v. DeMarco*, 350 Pa.

Super. 490, 495, 504 A.2d 1256, 1258 (1985); *Novak & Co., Inc. v. Facilities*

*Development Corp.*, 109 A.D.2d 1013, 1014, 486 N.Y.S.2d 490, 491 (N.Y. App. Div.

1985).

We must speculate as to the underlying facts on which the superior court

concluded that Mark Sebastian constitutes a danger of substantial damage to one or both

child's psychological or physical development. The court heard evidence of the autism

of Quinton. The court heard testimony about Sebastian's outbursts of anger,

dysregulation of emotions, rough handling of the boys, corporal punishment of the sons,

accusations of racism against all white people, and refusal to cooperate with DCYF social

workers. We later analyze these categories of behavior, including their degree and

frequency.

The State underscores that Mark Sebastian suffers from unstable mental health.

The State argues that mental health difficulties cause Sebastian emotional dysregulation,

agitation, frustration, escalation, and fixation on topics. In turn, according to the State,

Sebastian struggles to focus on the children. On past occasions, when he has become

angry, the children froze and stopped making noise. Nevertheless, scores of parents grow

angry in front of children and the children grow frightened. The State does not take away

children because of parental anger. We note that the only dysregulation or escalation that

27

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

occurred was when State actors interfaced with Sebastian. No percipient witness testified to any outbursts of Sebastian when state actors were not present.

Mental illness is not, in and of itself, proof that a parent is unfit or incapable. *In re Dependency of T.L.G.*, 126 Wn. App. 181, 203, 108 P.3d 156 (2005). Mental illness does not support a finding of dependency unless it interferes with the parent's parenting ability. *In re Dependency of Schermer*, 161 Wn.2d 927, 945, 169 P.3d 452 (2007); *In re Dependency of T.L.G.*, 126 Wn. App. 181, 203 (2005).

The family therapy provider, Joanna Rice, testified that Mark Sebastian performed well with Quinton and Sonny, met their needs, and quickly redirected their behavior. Rice opined that, if Quinton and Sonny see and hear Sebastian growing upset, the boys will not feel safe. But most children experience this feeling when a parent gets perturbed. Such evidence does not rise to the level of establishing that the children are in circumstances which constitute a danger of substantial damage to their psychological or physical development.

Leann Kaufman, from Crossroads Visitation, testified that Mark Sebastian always directed his anger toward visitation staff or social workers and not towards his sons. Kaufman had no concerns with Sebastian's visits with the children, other than his escalation and frustration with the staff. Grace Hatch testified "I've never witnessed any emotional disregulation [sic] being a threat towards his children." RP at 180.

28

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

Mark Sebastian became the target of many unfounded, if not false, allegations, which led to CPS interfering in his life with his children. We may not condone his behavior, but his expression of anger toward his accusers and CPS is understandable under these circumstances.

We note that at the shelter care hearing the superior court ordered the State to afford visitation to Mark Sebastian with his sons three times per week for two hours each time. This dependency order incorporated a similar order of visitation. Because of COVID, DCYF and its provider scheduled visits by zoom. Because of the location of Quinton's foster home, DCYF cancelled Quinton's participation in visits. Nevertheless, the shelter care order did not allow visitations by zoom, nor allow DCYF to shirk its obligation to provide visitation on the location of a child. DCYF wants Sebastian to obey court orders, yet it violates court orders. If DCYF thought it could not meet the terms of the order, it could have applied to the superior court for relief. Sebastian legitimately grew angry when DCYF failed to provide visitation with both of his sons. If DCYF is concerned about anger from Sebastian, DCYF can take steps to reduce the anger.

The State never investigated Mark Sebastian's complaints about West Central Community Center. The State never investigated Sebastian's accusations that he suffered abuse as a foster child. For all we know, Sebastian's allegations of mistreatment are true. For all we know, Sebastian holds legitimate reasons to be angry with CPS and DCYF.

29

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

The law does not allow a child to be taken away from a parent because of the parent's anger toward CPS, DCYF, or state providers, even if the anger is illegitimate.

The State emphasizes that Quinton needs specialized care and that Mark Sebastian lacks the current capability to perform this care. The superior court made no such finding. A child with autism does not handle change well. Instead of keeping Quinton with his brother and father, whom he loves, DCYF has shifted Quinton to various foster homes. The harm of changing foster homes often overweighs the harm of keeping a child with a subpar inadequate parent.

> The United States has a long history of separating children, especially Black, Latinx, and Native children, from their families. In 2016, according to a 2018 report, there were over 400,000 children in foster care, a 10 percent increase from 2012. The majority of children removed by child welfare systems are taken because of alleged neglect, a label that can too easily be applied to parents living in poverty. The removal of children, which is done in the name of protection, too often leads to them being placed in foster care systems where they receive little care, little protection from harm, and little stability. Rather, these systems can inflict enormous damage.

Vaidya Gullapalli, *The Damage Done by Foster Care Systems*, THE APPEAL, (Dec. 18, 2019.

Much of the testimony the State presented constituted hearsay. This includes testimony that Mark Sebastian threatened to kill a social worker, Sebastian swung at another patient at a physician's office, Sebastian hit Sonny, Sebastian threw unoccupied car seats across a parking lot, Sebastian yelled at the boys and told them not to look at

30

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

him, Sebastian commented that the boys "were a pain in the ass," Sebastian hit one of the

boys, Sebastian remarked that he would take one of his son's home and feed him Tylenol

until he dies, and Sonny expressed fear of his father. We do not know whether the

alleged ripping of a car door is based on hearsay. All of this testimony could have

included multiple levels of hearsay. The rules of evidence apply to a dependency

hearing. RCW 13.34.110(1); ER 1101(c)(3); *In re Dependency of K.N.J.*, 171 Wn.2d

568, 579, 257 P.3d 522 (2011).

In *In re Welfare of X.T.*, 174 Wn. App. 733, 300 P.3d 824 (2013), this court

reversed a finding of dependency on the ground that the Department of Social and Health

Services social worker's testimony was based on her review of the department's file.

This court observed that the trial court's discretion does not permit juvenile courts to

disregard evidence rules, especially when the deprivation of parental rights is involved.

The court held that parents should not be deprived of parental rights on hearsay, a form of

unsworn testimony. A social worker may refer to a written report to show the basis of the

worker's opinion, but written reports are not substantive evidence.

The State introduced as evidence many comments purportedly uttered by Mark

Sebastian. If the hearer of those alleged remarks testified to the remarks, the remarks

would not constitute hearsay because of their nature as admission by party-opponent

under ER 801(d)(2). But often no percipient listener testified. The State did not even

identify who allegedly heard many of the comments.

31

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

Mark Sebastian told one of the fact-finding hearing witnesses, Sarah Paukstis, that he spanked his boys. Nevertheless, he described a spank as a tap on the rear end. No one saw bruises on the boys' bottoms.

This opinion author's parents spanked him. Although the majority of professionals now discourage spanking, many parents still employ this corporal punishment. The Christian group Focus on the Family encourages spanking and offers, on its website, parental tips for effective spanking. Many parents follow the Biblical admonitions: "Whoever spares the rod hates their children, but the one who loves their children is careful to discipline them." Proverbs 13:24, New International Version (NIV). "Punish them with the rod and save them from death." Proverbs 23:14, NIV.

In *In re Welfare of Gregoire*, 71 Wn.2d 745, 430 P.2d 983 (1967), the spankings of the mother and stepfather left bruises on the boy's anatomy. The stepfather had also dragged the boy by the hair. The Supreme Court affirmed an order determining that child was dependent and directing parents to refrain from further administration of corporal punishment for a period of one year. The trial court did not remove the son from the home.

CPS investigated many allegations against Mark Sebastian and found them unsubstantiated. Social workers and others with percipient knowledge have never seen bruises on one of the boys.

32

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

We recognize the testimony of Jessica Hertlein and Sarah Paukstis that Mark Sebastian threw the boys on the couch during the intervention on September 3, 2019. We do not know how far the boys were thrown. Neither Hertlein nor Paukstis testified to any physical injury to the boys.

*In re Dependency of C.M.*, 118 Wn. App. 643, 651 (2003) illustrates a dependency, under RCW 13.34.030(6)(c), supported by sufficient evidence and findings of fact. The trial court entered a finding of fact that "[t]he child is in circumstances which constitute a danger of substantial damage to his physical and psychological development because these special needs are not being addressed and met." The child's pediatrician testified that the child showed language development delays and the three-year-old child's memory did not correlate to the average child's memory at that age. The pediatrician testified that the father provided insufficient stimulation from activities like talking to the child and reading to him. A therapist testified the father's cognitive problems interfered with his ability to implement proper parenting techniques. The therapist echoed the pediatrician's testimony that the child encountered significant cognitive delays.

*C.M.* highlights what is missing in the present appeal. No physician, therapist, or counselor testified that Mark Sebastian could not care for the needs of his sons. Sebastian had available resources to assist him in those needs and the undisputed evidence showed that he would rely on those resources. No one testified that Mark

33

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

Sebastian endangered the safety of his sons. No one testified that Sebastian would thwart his son's development. No one testified that Sebastian failed to attend to Quinton's autism.

One or more State witnesses typically render an opinion that repeats magic words needed to sustain a dependency or a parental termination. None of the State's witnesses opined that Mark Sebastian's care for Quinton and Sonny would lead to substantial damage to the boys' respective psychological or physical development.

As part of finding of fact 7, the superior court found that Mark Sebastian "perseverates on racial injustice and is preoccupied with the racial makeup of those around him." CP at 412. The State entreats us to avoid addressing whether substantial evidence supports the finding. The State agrees the finding does not support the dependency and should be stricken. We wonder why the State originally placed the finding in the order of dependency drafted by it if it wishes for us to ignore the finding.

The gist of the dependency of Quinton and Sonny is that Mark Sebastian is overly aggressive, angry, and reluctant to listen to DCYF social workers. Because of his blackness, he purportedly wrongfully accuses others of racism. But we share Sebastian's concerns. Julie Ancona-Shepard testified that that the State's concerns cater to the stereotypical perception of a loud, black man.

On June 4, 2020, the Washington Supreme Court issued an open letter to the state judiciary and legal community. Letter from Wash. State Supreme Court to Members of

34

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

Judiciary & Legal Cmty. (June 4, 2020),

https://www.courts.wa.gov/content/publicUpload/Supreme% 20Court%

20News/Judiciary% 20Legal% 20Community% 20SIGNED% 20060420.pdf

[https://perma.cc/QNT4-H5P7].  The full text of the open letter is appended to this

opinion.  Presumably the protests surrounding the deaths of George Floyd, Breonna

Taylor, and Ahmaud Arbery, the false accusations of Karens against African-American

males, and the many corporate pronouncements supporting Black Lives Matter prompted

the Supreme Court's letter.  Many unnecessary deaths of Black men and women have

occurred since the summer of 2020.

The Supreme Court's June 2020 letter mentions "racialized policing" and the

"overrepresentation of black Americans in every stage of our criminal and juvenile

justice systems."  Letter from Wash. State Supreme Court to Members of Judiciary &

Legal Cmty., *supra*, at 1.  This message should extend to the Washington State

dependency system.  A seminal 2017 study found that a shocking 53 percent of Black

children in the United States will be investigated as potential victims of child abuse by

age eighteen, as compared to 37 percent of all children.  Hyunil Kim et al., *Lifetime*

*Prevalence of Investigating Child Maltreatment Among US Children*, 107 AM. J. PUB.

HEALTH 274 (2017).

According to the study, once in the system, Black children are more likely to

languish in foster care, less likely to be reunified with their families, more likely to be

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

placed in group care, age out in greater numbers, and become involved in the criminal justice system. A pipeline feeds youth in foster care and juvenile justice facilities into the adult criminal legal system. According to a 2020 government study, Black children account for 23 percent of children in foster care, even though they comprise only 14 percent of the population of children. The AFCARS Report, U.S. Department of Health and Human Services, Administration for Children and Families, Administration on Children, Youth and Families, Children's Bureau. https://www.acf.hhs.gov/cb

According to the Washington Supreme Court, the Washington State legal community must recognize that we all bear responsibility for enduring injustice resulting from racism. The letter exhorts the community to exercise the courage and will to end the injustice. The letter continues that judges must develop a greater awareness of our own conscious and unconscious biases in order to administer justice in a way that brings racial fairness to our legal system. The Supreme Court ends by calling on "every member of our legal community to reflect on this moment and ask ourselves how we may work together to eradicate racism." Letter from Wash. State Supreme Court to Members of Judiciary & Legal Cmty., *supra*, at 2.

Nothing has changed in all Washington court levels since the Supreme Court's June 2020 open message about racial injustice. The racism inherent in our court system and the child dependency system continues.

36

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

The superior court, in Mark Sebastian's case, never confronted the possible racial bias in the child dependency system. Instead, the superior court asked the NAACP representative if she was explicitly biased when she observed racism against African Americans in the system.

CONCLUSION

We remand for the vacation of the dependency order and return of Quinton and Sonny to their father's care and custody.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

I CONCUR:

_____
Siddoway, C.J.

I CONCUR AS TO RESULT ONLY:

_____
Staab, J.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*



The Supreme Court
State of Washington

June 4, 2020

Dear Members of the Judiciary and the Legal Community:

We are compelled by recent events to join other state supreme courts around the nation in addressing our legal community.

The devaluation and degradation of black lives is not a recent event. It is a persistent and systemic injustice that predates this nation's founding. But recent events have brought to the forefront of our collective consciousness a painful fact that is, for too many of our citizens, common knowledge: the injustices faced by black Americans are not relics of the past. We continue to see racialized policing and the overrepresentation of black Americans in every stage of our criminal and juvenile justice systems. Our institutions remain affected by the vestiges of slavery: Jim Crow laws that were never dismantled and racist court decisions that were never disavowed.

The legal community must recognize that we all bear responsibility for this on-going injustice, and that we are capable of taking steps to address it, if only we have the courage and the will. The injustice still plaguing our country has its roots in the individual and collective actions of many, and it cannot be addressed without the individual and collective actions of us all.

As judges, we must recognize the role we have played in devaluing black lives. This very court once held that a cemetery could lawfully deny grieving black parents the right to bury their infant. We cannot undo this wrong—but we can recognize our ability to do better in the future. We can develop a greater awareness of our own conscious and unconscious biases in order to make just decisions in individual cases, and we can administer justice and support court rules in a way that brings greater racial justice to our system as a whole.

As lawyers and members of the bar, we must recognize the harms that are caused when meritorious claims go unaddressed due to systemic inequities or the lack of financial, personal, or systemic support. And we must also recognize that this is not how a *justice* system must operate. Too often in the legal profession, we feel bound by tradition and the way things have "always" been. We must remember that even the most venerable precedent must be struck down when it is incorrect and harmful. The systemic oppression of black Americans is not merely incorrect and harmful; it is shameful and deadly.

**For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.**

No. 38027-1-III cons. w/38028-9-III
*In re Dependency of Q.S. & S.S.*

Finally, as individuals, we must recognize that systemic racial injustice against black Americans is not an omnipresent specter that will inevitably persist. It is the collective product of each of our individual actions—every action, every day. It is only by carefully reflecting on our actions, taking individual responsibility for them, and constantly striving for better that we can address the shameful legacy we inherit. We call on every member of our legal community to reflect on this moment and ask ourselves how we may work together to eradicate racism.

As we lean in to do this hard and necessary work, may we also remember to support our black colleagues by lifting their voices. Listening to and acknowledging their experiences will enrich and inform our shared cause of dismantling systemic racism.

We go by the title of "Justice" and we reaffirm our deepest level of commitment to achieving justice by ending racism. We urge you to join us in these efforts. This is our moral imperative.

Sincerely,

Debra L. Stephens,
Chief Justice

Charles W. Johnson,
Justice

Barbara A. Madsen,
Justice

Susan Owens, Justice

Steven C. González,
Justice

Sheryl Gordon McCloud,
Justice

Mary I. Yu, Justice

Raquel Montoya-Lewis,
Justice

G. Helen Whitener, Justice

**For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.**

39